AO 91 (Rev. 02/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Delaware

| | |
|---|---|
| United States of America<br>v.<br>HONG MENG<br><br>*Defendant* | ) <br> ) <br> ) Case No. 09- 127M <br> ) <br> ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of __08/15/2009__ in the county of _____ in the _____ District of __Delaware__, the defendant violated __18__ U. S. C. § __1030(a)(2)(C)__, an offense described as follows:

Intentionally accessing a computer without authorization or exceeds authorized access, and therefore obtains information from any protected computer.

This criminal complaint is based on these facts:
See Attached affidavit, incorporated in full herein.

☑ Continued on the attached sheet.

F I L E D

OCT - 1 2009

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

*Katherine E. Pattillo*
*Complainant's signature*

Katherine E. Pattillo
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __10/1/09__

City and state: __Wilmington, DE__

*Judge's signature*

Hon. Mary Pat Thynge, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Katherine E. Pattillo, being duly sworn, state the following:

### A. Introduction and Agent Background

1. I am a Special Agent in the Federal Bureau of Investigation. I am currently assigned to the Baltimore Division's Wilmington Resident Agency where I am responsible for the investigation of, among other things, violations pertaining to economic espionage and theft of trade secrets. I have received training from the FBI in counterintelligence and espionage investigative matters. Prior to my employment with the FBI, I spent five years as an Intelligence Officer with the United States Navy. During the course of my employment with the military, I received counter-intelligence training and became familiar with United States foreign counter-proliferation issues. I have been assisted in my investigation by acting Supervisory Special Agent Brian M. Walsh who has over six years of counter-intelligence experience in the FBI and Supervisory Special Agent (SSA) Jeffrey A. Reising who has 12 years of criminal and counter-terrorism experience.

2. I make this affidavit in support of a Criminal Complaint and Arrest Warrant for Hong Meng for the unauthorized access of a protected computer, in violation of Title 18, United States Code, Section 1030(a)(2)(C). This Affidavit is based on my personal knowledge and observations as well as information provided to me by other law enforcement officers. Because this Affidavit is solely for the purpose of establishing probable cause, not all facts relating to the investigation are included herein.

### B. Facts in Support of Probable Cause for Violation of 18 U.S.C. § 1030(a)(2)(C)

3. Hong Meng is a former employee of DuPont USA, a division of E.I. duPont

de Nemours and Company. According to DuPont Human Resources records, Meng applied for a position at DuPont on March 30, 2002. He joined the company on November 7, 2002 as a Research Chemist at DuPont's Experimental Station. He was promoted to Senior Research Chemist in May of 2006.

    4.    During his time at DuPont, Meng worked on organic light emitting diode ("OLED") technology, and specifically on the organic synthesis of molecules used in OLED technology. OLED technology promises highly-efficient, paper-thin computer or other displays. According to the company, DuPont purports to be a leader in the solution process technology for OLED displays, a next-generation display technology. DuPont claims that its multiple innovations in this emerging technology field position it to be a leader in the next generation of display technologies for multiple applications.

    5.    Meng routinely had access to cutting edge OLED research, which is considered by DuPont to be trade secret information. Extensive measures are undertaken by DuPont to protect the confidentiality of such material. With respect to OLED research specifically, research data is stored in three separate Lotus Notes databases, to which access is highly controlled. Even within the OLED research team, only certain team members are granted access to the database containing the most recent technology developed by the OLED team. In order to connect to the system, users must satisfy an enhanced computer security system. That system is both password protected and requires the user to enter an additional numeric code to access it. DuPont employees are further prohibited by policy, and electronically by the network infrastructure, from remotely accessing their work email accounts from any computers that have not been issued by DuPont.

6. OLED team members also utilize an additional database to store data, and such database may only be accessed if the employee acknowledges that the information contained within the database is "confidential information." The acknowledgment further recognizes that "information retrieved from the . . . database and displayed by the . . . Directory may be proprietary and should be handled according to DuPont Information Security (DISO) policies based on a record's DISO security class designation."

7. On approximately July 30, 2009, Meng notified DuPont USA that he would be resigning from DuPont USA to take a position offered by DuPont China, and that his last date of employment would be August 21, 2009. On August 5, 2009 at approximately 10:00 a.m., Meng met with his supervisor, Charles Brandenburg, in order to read and sign his Separation Letter. During the meeting, Meng asked Brandenburg whether he could transfer all the data from his DuPont-issued laptop computer to DuPont China. Brandenburg informed Meng that the data could not be transferred without clearance from the DuPont Security, Legal, and Human Resources components. Meng signed the Exit Agreement, which certified that he "transferred all company records in accordance with a plan discussed by my immediate supervisor/manager," and further confirmed that he did not have in his possession, among other items, any DuPont documents, lab notebooks, or customer lists.

8. At approximately 12:20 p.m. on the same date, Meng sent an email to DuPont's Information Technology (IT) Department stating that Brandenburg had approved the transfer of data from Meng's harddrive to DuPont China, and asked how he would be able to carry out the transfer. At approximately 12:46 p.m., Brandenburg sent a reply email to all addressees of the initial Meng email stating that the transfer of data had not been approved.

At approximately 12:55 p.m., Meng sent a reply email to all of the initial addressees which stated, in part, "Thanks for the INFO. Then I will wait until next week for your feedback."

9. On August 13, 2009, at approximately 9:00 a.m., Brandenburg and another DuPont USA employee met with Meng. During the meeting, Brandenburg informed Meng that the data on the DuPont laptop would have to be reviewed by the company's DISO, and that Meng would have to turn in his laptop that morning. Meng turned in his computer at approximately 9:20 a.m. On or about August 13, 2009, DuPont utilized an outside consulting firm to examine forensically Meng's laptop computer. The firm created an image of the hard drive which was later used to examine its contents

10. Brandenburg returned the computer to Meng on August 14, 2009, at approximately 9:40 a.m. At that time, Brandenburg informed Meng that Meng could not transfer any DuPont Confidential Information until he received further guidance from DuPont DISO, Legal, and Human Resources, which would likely be sometime the following week. Meng informed Brandenburg that he understood. Meng further sent an email at approximately 9:53 a.m. stating that "My access to the current database will be determined by next week."

11. Despite Meng's oral and written communications evincing his understanding that he could not transfer DuPont confidential information from his work-issued laptop, Meng nevertheless proceeded to do so. A forensic computer report compiled on behalf of DuPont demonstrates that Meng downloaded approximately 595 documents from his work-issued laptop to an external computer storage device. The downloads began at approximately 4:17 a.m. on August 15, 2009 – less than 24 hours after Meng affirmed his understanding that

he was not to transfer any DuPont data from his work computer. Meng's application of the external storage device to transfer computer data exceeded Meng's authorized access to his work-issued laptop. DuPont's prohibition of Meng transferring any data was communicated to him on several occasions, and affirmatively acknowledged by Meng, as set forth above.

12. All of the documents were downloaded from Meng's work-issued laptop. The majority of the documents originated from the protected Lotus Notes databases. The documents consisted primarily of DuPont confidential Modeling reports – these files are instrumental in guiding DuPont's OLED research priorities and in measuring the commercial viability of OLED material prototypes. In addition, Meng downloaded a Microsoft Word document that contained a specific chemical procedure that DuPont has invented to improve the stability, performance, and purity levels of organic electronic materials. Furthermore, one particular document was a summary of the OLED program to date, and it described in detail the particular technology and chemical structures used to develop the next generation of OLED technology.

13. In addition to the OLED technology, additional information was found on Meng's DuPont-issued computer which revealed that Meng had accepted a position with Peking University. Although DuPont employees have worked concurrently with research universities, they are required to approve such outside employment with the company. Meng failed to notify DuPont that he had accepted employment with Peking University in the College of Engineering, Department of Advanced Materials and Nanotechnology.

14. According to DuPont Corporate Security, Meng was interviewed by Brandenburg and DuPont Corporate Security Official Donald Palmatary on August 19, 2009.

During this time, Meng initially denied having any relationship with Peking University. He also initially denied that he had any DuPont Confidential Materials in his possession, other than on his DuPont-issued laptop, and he denied downloading such materials from his laptop to any external drive.

15. When confronted with the discrepancy between what his laptop indicated and his claim to have never downloaded DuPont Confidential Material, Meng eventually admitted during the course of the August 19th interview that he had an external drive – the Jump Drive – that he used to download DuPont Confidential Materials. He continued to deny having possession of any other electronic or hard copy form of DuPont Confidential Materials. Thereafter, Meng allowed DuPont Corporate Security personnel to take possession of his external Jump Drive.

16. While at Meng's residence on August 19, 2009, Donald Palmatary requested to examine Meng's personal computer in order to evaluate whether any DuPont Confidential Materials had been downloaded to the computer. Meng allowed DuPont Corporate Security to take possession of his personal computer for such review. Brandenburg confirmed that Meng's Computer contained electronic files of DuPont Confidential Materials related to OLED technology. Meng further told DuPont representatives that he believed he sent some of DuPont's information to his "UCLA" email account, referring to his Yahoo! account: hongucla@yahoo.com.

17. On August 20, 2009, Brandenburg and Palmatary again met with Meng regarding the documents that had been downloaded from his DuPont work-issued computer. During that meeting, Meng stated that he considered the documents that he downloaded from

6

his DuPont-issued laptop as "reference materials" for his DuPont job. Meng further denied transferring or forwarding any of those documents anywhere outside his control. In addition, Meng admitted that he had an ongoing relationship with Peking University. He stated that he had an email account with the University; that he has an office and sent "books" from DuPont Shanghai lab to the PKU office; and that he is actively looking for collaborators in the United States for Peking University. Meng denied, however, that he has received any funds from the University.

18. An ongoing forensic analysis of Meng's personal computer has identified at least 543 files that are present on the personal computer that were part of the August 15, 2009 file transfer. According to the forensic report, these files were uploaded from the external storage device to Meng's personal computer beginning at approximately 4:27 a.m. on August 15, 2009 – approximately ten minutes after Meng began downloading data from his work-issued laptop computer to the external storage device. At least 178 of those files were opened using Microsoft Internet Explorer, thus suggesting that Meng accessed and/or sent those documents using a private email account.

19. DuPont is a multi-national corporation that operates in more than 70 countries and across the world. DuPont offers a wide range of products and services for markets including agriculture, nutrition, electronics, communications, safety and protection, home and construction, transportation and apparel. As such, DuPont is a business engaged in interstate and foreign commerce.

20. A "protected computer" under Title 18, United States Code, Section 1030(a)(2)(C) is defined in Section 1030(e)(2) as a computer "which is used in or affecting

interstate or foreign commerce or communication."

21. Meng's DuPont-issued laptop computer was issued and used to develop organic electronic compounds to be applied in the field of OLED displays. DuPont is one of the leaders in solution process technology for OLED displays. OLED displays are considered to be the next generation of video, television, and computer display panels. The technology is expected to replace LCD and plasma display devices in the next several years. One major application for OLED processes is to give plasma display panel (PDP) manufacturers a competitive advantage by providing significant performance and cost benefits. DuPont has expended millions of dollars and 17 years of research and development in OLEDs, with a core focus on developing a combination of state-of-the-art materials and process technologies that will enable cost-effective production of high performance OLED displays. DuPont has become a leader within the competitive OLED marketplace, particularly with respect to its ability to extend the lifetime for the emitting diodes that are used in the OLED displays.

22. Meng's DuPont-issued computer was a computer used in or affecting interstate commerce. The computer – and specifically the data downloaded on August 15, 2009 – was directly involved in researching and storing information regarding organic electronic compounds that DuPont has developed. Those compounds have been and will continue to be marketed to PDP manufactures in the United States and in other countries in order to create OLED displays that will be marketed and sold throughout the World. As set forth above, DuPont has expended millions of dollars in research and development costs, and the value of the data downloaded by Meng onto the external storage device exceeds $5,000.

## Conclusion

23. Based on the foregoing facts and my training, knowledge and experience, it is my opinion that there is probable cause that Meng exceeded his authority to access a protected computer, in violation of Title 18, United States Code, Section 1030(a)(2)(C). Your affiant respectfully requests that the Court issue a criminal complaint and arrest warrant for Hong Meng.

*Katherine E. Pattillo*
Katherine E. Pattillo
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
on this ___1___ day of ~~September~~ 2009
              October

Hon. Mary Pat Thynge
United States Magistrate Judge

9