# Aaronson, Collins & Jennings, LLC
## Attorneys at Law

8 East 13th Street
P.O. Box 2865
Wilmington, DE 19805

*Jennifer-Kate Aaronson*
*Patrick J. Collins*
*Kathleen M. Jennings*

Tel: (302) 655-4600
Fax:(302) 655-4622
www.acjdelaware.com

August 30, 2010

*Via CM/ECF & Hand Delivery*
The Honorable Sue L. Robinson
United States District Court
844 North King Street
Wilmington, DE 19801

    Re:    <u>United States v. Hong Meng; Criminal Action No. 10-56 (SLR)</u>

Dear Judge Robinson:

    Please accept this letter as Hong Meng's Sentencing Memorandum in support of a downward departure from United States Sentencing Guideline Level 13. As the United States Supreme Court observed:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Koon v. United States*, 116 S. Ct. 2035, 2053 (1996). [1] Hong Meng accepts the Pre-Sentence Report calculation of the Guideline. This is only the beginning of the analysis, however, because the true measure of this man is much greater than the crime at issue.

## I.    *The Offense Conduct*

    The defendant objects to Paragraph 12 of the Presentence Report because it recites alleged conduct that is in conflict with Paragraph 3(c) of the Plea Agreement. In stating that the defendant "accepted a position as a faculty member at PKU's College of Engineering...," Paragraph 12 gives an incomplete picture of the facts concerning the defendant's employment relationship with PKU. Paragraph 3(c) of the Plea Agreement includes the following statement with respect to the defendant's employment with PKU:

---

[1] Counsel has researched and discussed with Hong Meng the adjustment for abuse of a position of trust and can find no good faith basis to oppose its imposition.

The Honorable Sue L. Robinson
August 30, 2010
Page -2-

> The defendant, however, never commenced employment with
> PKU and was never paid a salary or other compensation by PKU,
> except for reimbursement of some travel expenses.

On July 31, 2009, DuPont offered the defendant the opportunity to transfer his employment from DuPont USA to DuPont China, Shanghai Branch ("DuPont China"). This transfer opportunity was unexpected, as the defendant had requested such a transfer on several occasions in the past and had always been told that such a transfer would not be offered. One of the reasons that the defendant had been seeking such a transfer was that the defendant's wife and children reside in Shanghai, China. The transfer offer was accepted by the defendant on August 4, 2009. After he decided to accept the transfer to DuPont China, the PKU offer was withdrawn. (Exhibit 1). Also, see Plea Agreement, Par. 3(e). Upon Hong Meng's transfer to DuPont Shanghai, it was contemplated that Hong Meng would continue to work with the OLED team, although he would not necessarily always continue to work on Gen III research. (*See* Federal Bureau of Investigation interviews of Curtis Fincher, Weiying Gao, Norman Herron, Che Hsu, Nora Radu, attached hereto as Exhibit 2A through E).

## II.    *This crime is an aberration for Hong Meng*

Hong Meng was born on July 26, 1966 in a small village in rural China. His parents were itinerant farmers who traveled hundreds of miles to work. Hong was raised by his aunt, whom he calls his second mother. Hong has many siblings, all of whom reside in China. Hong became the highly successful child in the family. He attended the best universities in China and attained his Ph.D. in Organic Chemistry at UCLA in 2002. Hong Meng worked so hard that his family hid his own father's death from him so as not to distract him from work. Hong has also lost his natural mother. His second mother died this July, and Hong was unable to see her before she died, nor attend her funeral.

Except for periodic visits to China, Hong has been separated from his wife and children since July 2004, when his wife and daughters moved from the United States to China out of concern for the health of his wife's family. Hong's wife works for DuPont in China. His daughters attend school there. Hong must pay for his younger daughter's education because she was born in the United States. As the attached letters attest, Hong is a dedicated family man who is dearly missed by his children and his wife. He has not seen them for over one year and the separation has resulted in several episodes of severe depression. (*See* letters from family members attached hereto as Exhibit 3 and photographs of his family attached hereto as Exhibit 4). Hong has also provided financial support for his extended family. He has paid education expenses for his nieces, (Exhibit 5), and has sent additional funds to China for their support. He has also given money to build a road in his village. (*See* Huan City acknowledgement of donation and Fang Fang Chen, Ph.D.'s translation of same, and photographs of village road, attached hereto as Exhibit 6).

The Honorable Sue L. Robinson
August 30, 2010
Page -3-

      He is a member of the Wilmington Community Evangelical Church. While the Chinese government frowns upon religion, Hong has found great comfort and hope through his Church. He is an avid reader of the Bible and attends Church regularly. Hong never does anything halfway, however, and he has become an integral part of the Church community. He visits the Franciscan Nursing Home on behalf of the church, assists with food preparation at Church, solicited help for earthquake relief in Haiti and drives University of Delaware students to buy groceries on a routine basis. (*See* letters and photographs attached hereto as Exhibit 7).

      Hong Meng has won the respect and admiration of his colleagues for his dedication and outstanding work in his scientific field. Perhaps to a fault, Hong Meng has dedicated his entire adult life to his work. As Dr. Michael Bendikov writes of Hong Meng at UCLA, "… Dr. Meng stood out on account of his outstanding devotion to science, his very hard work and his unusual scientific and personal vision. Indeed, Dr. Meng is a pure scientist: he regards scientific progress as his first *personal* priority in life." His former colleague, Bin Mia, notes that Hong Meng "… has been very productive and published a number of high caliber papers in well-known world-class journals such as *Science, The Journal of American Chemical Society*. He is an excellent scientist full of innovation, creativity and hardworking." His colleagues agree that Hong Meng is among the most brilliant and dedicated scientists with whom they have worked. (*See* letters attached hereto as Exhibit 8).

      Hong Meng's resume is replete with achievements and awards. He is the primary or sole inventor on 8 patents, with many others in progress. He has authored 43 scientific articles and co-authored a book on Organic Light Emitting Materials and Devices. (*See* resume attached hereto as Exhibit 9). The contributions he has made endure to this day. Hong Meng recently reviewed and signed 14 patent applications on behalf of the DuPont Company. He is the primary or sole inventor on those applications. He has and will continue to assist DuPont in its efforts to patent the scientific inventions made possible in significant measure through Hong Meng's work.

      Of course, in sentencing the defendant, the Court must weigh the offense that he has committed against his considerable accomplishments and good works. The defendant acknowledges that his conduct has caused serious damage to DuPont and disappointment among the members of his team and his supervisors whose trust and confidence he betrayed. The defendant will forever feel the shame of that betrayal. He knows that he can never again work for this highly respected company.

      The defendant acknowledges that his acts will forever tarnish his considerable reputation in the scientific community. In all likelihood, he will be unable to continue his work in OLED research and will be banned from reputable studies in the field and university work. For someone like the defendant, whose work has literally been his life, those consequences are, no doubt, the greatest punishment of all.

The Honorable Sue L. Robinson
August 30, 2010
Page -4-

He must remake himself, and he realizes that. He strongly desires to go home to his family, where he hopefully will have the opportunity to do good works in a different field in order to continue to help his family prosper. Hong Meng fully acknowledges his guilt and that he is the reason for his professional demise. (*See* Acknowledgement of Responsibility attached hereto as Exhibit 10).

### III.   *Victim Impact*

In its assessment of this factor, it is submitted that the Court should also consider that there is no evidence that the trade secret formulas were disclosed to any person or organization outside DuPont. Shortly after the defendant's employment with DuPont was terminated, the package containing the "samples" was returned intact to DuPont. There is also no evidence that the defendant's conduct has in fact caused DuPont any economic harm apart from expenses incurred to investigate Hong Meng. The defendant acknowledges the anxiety and difficulty his theft has caused DuPont and does not intend to minimize that. The Government has acknowledged that there is no evidence that the formula nor any other information categorized as relevant conduct has been accessed by any third party.

### IV.   *The Law*

#### A. Sentencing Options

In fashioning an appropriate sentence, the Court must consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2). See, *Koon v. United States*, 116 S. Ct. 2035, 2053 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue").

The defendant does not dispute the accuracy of the Offense Level Computations in the Presentence Report, which yield a "guideline sentence of 12 to 18 months incarceration. However, under the unique facts and circumstances of this case, it is respectfully submitted that the Court should consider a downward departure and impose a sentence of probation, to be terminated upon the deportation of the defendant to China.

Deportation looms as the most important and salient variable in Hong Meng's future. As noted in the Presentence Report, the defendant is a citizen of the Republic of China and is also a lawful permanent resident of the United States. The defendant has filed an application for citizenship which has been denied due to the conviction in this case. Thus, one of the consequences

The Honorable Sue L. Robinson
August 30, 2010
Page -5-

of the defendant's conviction is the possibility that he will be deported to China. In his case, the mere possibility of deportation will have significant and harsh consequences not envisioned by the Sentencing Guidelines. If the defendant is incarcerated, even though his offense is nonviolent, the Federal Bureau of Prisons (BOP) will treat him as a "deportable alien," thus making him ineligible to serve any incarceration at a minimum security prison camp for which he would otherwise qualify.

The BOP categorically assumes that all non-citizens in its custody are deportable. *See* BOP Program Statement 5100.8 on Inmate Security Designation and Custody Classification (2006) at Chapter 5, Page 9 (defining a "Deportable Alien" as "a male or female inmate who is not a citizen of the United States"). Inmates who are not United States citizens are assigned a "public safety factor" in determining the security level appropriate to the inmate. See, BOP Program Statement 5100.8 at Chapter 5, Page 9. In addition to "non-citizens," other inmates who warrant a Public Safety Factor rating under BOP policies include sex offenders, inmates who have previously tried to escape from prison, and those who have previously engaged in "a serious incident of violence" in prison. *Id.* at Chapter 5, pp 7-10. As a result of this policy, which equates non-citizens with dangerous and disruptive inmates, the defendant will be ineligible to serve his sentence in a minimum security institution, such as a prison camp. *Id.* at p. 9 (as a result of Public Safety Factor, a non-citizen inmate "shall be housed in at least a Low security level institution"). The defendant will also be ineligible to serve the final 10% of his sentence in a halfway house or home confinement, even if otherwise eligible to do so under BOP rules. *See* BOP Program Statement 7310.04 on Community Corrections Center Utilization and Transfer Procedures (1998), p. 10 (barring eligibility for release to halfway house or home confinement to "inmates who are assigned a 'Deportable Alien' Public Safety Factor"). In fact, BOP takes the position that, pursuant to its authority to designate the location of an inmate's imprisonment under 18 U.S.C. § 3621(b), it has the power to place an inmate in a halfway house to serve *more* than just the last 10% of his sentence. *See* BOP Program Statement 7310.04 on Community Corrections Center Utilization and Transfer Procedures (1998) at Page 4. Thus, absent BOP's policy on aliens, the defendant would be eligible to serve his entire sentence in a halfway house if BOP determined this to be appropriate.

As a result of this overly simplistic and inflexible BOP policy, the defendant would be not be allowed to be incarcerated is a minimum security prison camp, and would serve any prison term in an institution with offenders who have committed serious crimes and who present significant security issues. The defendant submits that this factor should weigh heavily in favor of a non-prison sentence and immediate deportation to China. Even if a sentence of incarceration might otherwise be warranted as a result of balancing the § 3553(a) factors in this case, it would be particularly inappropriate — and clearly "greater than necessary" to satisfy the sentencing purposes of the statute — to require the defendant to serve time in such a harsh prison environment.

Furthermore, if the defendant is sentenced to a term of incarceration, at the end of that sentence, the defendant will not be released, but instead will be be sent to an immigration facility

The Honorable Sue L. Robinson
August 30, 2010
Page -6-

operated by the immigration authorities for further detention awaiting a deportation hearing. This additional period of incarceration has no time limit. According to a recent report by the Transactional Records Access Clearinghouse at Syracuse University, the number of cases awaiting resolution before the Immigration Courts reached an all time high of 247,922 in June, 2010. The same report found the average length of time for a case to be resolved has increased to 459 days. As a result, the defendant could serve as much as an additional 15 months in prison awaiting deportation. TRAC's latest report on the Immigration Courts can be viewed at http://trac.syr.edu/immigration/reports/235/.

As a result of BOP's policies and the operation of the immigration laws, the defendant will be subjected to a harsher punishment than a similarly situated defendant who is a U.S. citizen. The Supreme Court and the Second Circuit have long held that, where the unique circumstances of a defendant make a prison sentence harsher than otherwise warranted, a departure is appropriate. *Koon*, 116 S. Ct. 2035 (1996) (departure warranted where defendants' status as police officers and the notoriety of their crime made them unusually susceptible to abuse in prison); *United States v. Lara*, 905 F.2d 599, 602-03 (2d Cir. 1990) (affirming departure where defendant's "potential for victimization" in prison would likely lead to his serving his prison sentence in solitary confinement); *United States v. Hammond*, 37 F. Supp. 2d 204, 207-08 (E.D.N.Y. 1999) (granting departure where defendant's HIV positive status would lead to him serving "his full term in restricted confinement, a penalty far more difficult to endure than customary incarceration"); *United States v. Volpe*, 78 F. Supp. 2d 76, 87-89 (E.D.N.Y. 1999) (granting departure to police officer who due to notoriety of his crime, and for his own protection, "could serve a substantial portion of his sentence in some form of segregation" in prison).

Deportation is no mere collateral consequence to a conviction. As the United States Supreme Court recently held in *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010), the landscape of immigration law has altered dramatically over the years such that the class of deportable offenses has been expanded and the authority of judges to ameliorate the harsh result of deportation has been narrowly circumscribed if not eliminated entirely in many instances:

> These changes confirm our view that, as a matter of federal law, deportation is an integral part-indeed, sometimes the most important part- of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes.

*Id.* at 1480.

Four circuits have held that alienage, or the collateral consequences flowing therefrom, may be a basis for departure in some circumstances. *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997); *United States v. Charry Cubillos*, 91 F.3d 1342, 1344 (9th Cir. 1996); *United*

The Honorable Sue L. Robinson
August 30, 2010
Page -7-

*States v. Smith*, 307 U.S. App. D.C. 199, 27 F.3d 649, 655 (D. C. Cir. 1994); *United States v. Lopez-Salas*, 266 F.3d 842, 847 (8th Cir. Neb. 2001)[2]

    Not only is deportation a valid consideration to the sentencing process, it clearly is integral to the defendant's punishment. In this case, the Guidelines provide a range of 12 to 18 months in prison. A three point departure would enable the defendant to avoid all incarceration and the attendant uncertain term that would follow. Moreover, the defendant will willingly agree to deportation. In *Rosario v. United States*, 625 F. Supp. 2d 123, 130 (S.D.N.Y 2008), the Court recognized its authority to grand a downward departure if the defendant consented to deportation as long as he presented a colorable, non-frivolous defense to deportation. In Hong Meng's case, deportation, though likely, is not entirely certain. His crime does not qualify as one of moral turpitude because he has been admitted to the United States for more than five years. 8 U.S.C. § 1227(a)(2)(A)(i). *See also, Aremu v. Department of Homeland Security,* 450 F.3d 578 (4th Cir. 2006). Theft of Trade Secrets may or may not qualify as an aggravated felony under 8 U.S.C. § 1101(a)(43)(G) and (M). *See Nugent v. Ashcroft*, 367 F.3d 162 (3rd Cir. 2004); *Bobb v. Attorney General of the United States*, 458 F.3d 213 (3d Cir. 2006). Moreover, under 8 U.S.C. § 1229b, the Attorney General may under certain circumstances cancel removal of a deportable alien. This area of the law is complex with many moving parts. If Hong Meng consented to removal, as he most certainly would, then the Government would be spared much time and effort in the process.

### B. Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Provide Adequate Deterrence

    The Supreme Court has recently observed that the need for a sentence to promote respect for the law does not invariably weigh in favor of imposing a prison sentence whenever it is among the available sentencing options. In *Gall*, the Court specifically agreed that the unique facts of the defendant's case supported the district court's conclusion that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." 128 S. Ct. at 599. *See United States v. Coughlin,* 2008 U.S. Dist. Lexis 11263 at *17 (W.D. Ark. February 1, 2008) (sentencing defendant with serious health problems to home confinement because prison conditions would endanger his life, and holding that "the Court is not unaware that the sentence imposed on Coughlin today will dismay those who feel that no punishment other than imprisonment can adequately punish [him] ... But the Court is more concerned with engendering derision for the law in those aware of Coughlin's medical condition that might well be outraged by a criminal justice system that ... produces a sentence plainly inhumane").

---

[2] The Third Circuit has never directly ruled on this ground as a departure consideration. *See United States v. Sonowo*, 2002 WL 1205057 (D. De. 2002). However, in light of *Gaull v. United States,* 128 S. Ct. 586 (2007), there is no rule that even requires "extraordinary circumstances" to justify a sentence outside the Guideline range.

The Honorable Sue L. Robinson
August 30, 2010
Page -8-

In Paragraph 70 of the the Presentence Report, it is noted that because the Guideline Range in this case is 13, the defendant is not eligible for probation pursuant to U.S.S.G. § 5B1.1, application note 2. However, the United States Sentencing Commission has submitted to Congress amendments to the Guidelines, effective November 1, 2010, that, among other changes, re-designates Level 13 from Zone D to Zone C. (See proposed Amendments to the Sentencing Guidelines, attached as Exhibit 2). This change is being proposed to reflect recognition of the value of sentencing alternatives and to recognize that often courts sentence individuals at Level 13 to 12 months and one day to enable the accumulation of good time credits such that the sentence effectively becomes ten and one-half months. Exhibit 2 at page 3. In Zone C, the defendant would be eligible for half of his sentence to be served on community or home detention. U.S.S.G. § 5C1.1(d).

In this case, a probationary sentence will reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2). First, a sentence of probation or home confinement would adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for Mr. Meng. If the Court were to grant a downward departure from Level 13, which would put the defendant in Zone C, then the Court would be permitted to impose a split sentence, which would mean as little as five months in prison. Guidelines § 5C1.1(d). Significantly, the Guidelines permit such a sentence for the typical, run-of-the-mill defendant. Here, the significant mitigating factors relating to Mr. Meng's role in the offense and his personal and family background provide compelling support for a completely non-jail sentence. While not minimizing Mr. Meng's offense, it is difficult to conclude that it is so serious, in light of his limited role, his lack of profit, and his otherwise positive and law-abiding life, that no other sentence except imprisonment will constitute just punishment in his individual case. Moreover, this is especially true where, as described above, any sentence would be served under harsher prison conditions than necessary due to a one-size-fits-all BOP policy with regard to aliens.

### C. Home Confinement

If the Court determines that a sanction of confinement is warranted, we ask the Court to consider continuing his existing term of home confinement. Such a sanction would allow Mr. Meng to continue volunteering his time and voluntarily deport himself at the end of his sentence, while otherwise limiting his freedom. Home confinement is defined by the United States Sentencing Guidelines as:

> A program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home

The Honorable Sue L. Robinson
August 30, 2010
Page -9-

> detention is imposed, the defendant is required to be in his place of
> residence at all times except for approved absences for gainful
> employment, community service, religious services, medical care,
> educational or training programs, and such other times as may be
> specifically authorized

U.S.S.G. § 5F1.2, Application Note 1.

As the Court is aware, the defendant has been under home confinement conditions as a condition of his pre-trial release for the past eleven months. During that time frame, his freedom has been very restricted but he has been allowed out for religious services and to volunteer with elderly people in his church. He has been totally compliant with all conditions, making him an excellent candidate for continued home confinement. Home confinement in the Federal system "ranges from a simple nighttime curfew to a 24-hour-a-day 'lock-down' home incarceration." Darren Gowen, "Overview of the Federal Home Confinement Program," *Federal Probation*, Page 11 (December 2000). The extent to which individuals are permitted to leave their residence is determined on a case-by-case basis, depending on the goals of supervision and the orders of the court. *Id.* If the Court determines that the "amenities available in the residence of a defendant would cause home detention not to be sufficiently punitive," it is permitted to "limit the amenities available." U.S.S.G. § 5F1.2, Application Note 2.

Over the past two decades, home confinement has gained acceptance in the Federal criminal justice community as a credible sanction and alternative to incarceration. Gowen at 12. Judges have imposed home confinement more frequently as they have "learned more about what it offers" and discovered its cost effectiveness. *Id.* at 11. Only recently has research begun to examine the effectiveness of community based sanctions such as home detention. In 2000, Robert Stanz and Richard Tewksbury evaluated the Jefferson County Home Incarceration Program in Kentucky. *Id.* at 11. The authors conducted a five year follow up study of 2,649 offenders who had participated in the program in 1990. While the majority of offenders (85%) successfully completed the program, several factors were found to increase the likelihood of success. For example, those offenders who were older, serving longer sentences, and came from less crime-ridden neighborhoods were more likely to successfully complete the period of supervision. In addition, research has found that offenders who are under electronic monitoring are less likely to commit new offenses than comparable offenders under different forms of supervision. *See also* Bonta, J., S. Wallace-Capretta and J. Rooney (2000). A quasi-experimental evaluation of an intensive rehabilitation supervision program. *Criminal Justice and Behavior* 27: 312-330; Courtright, K., B.L. Berg and R. Mutchnick (1997). The cost effectiveness of using house arrest with electronic monitoring for drunk drivers. *Federal Probation* 61:19-22; Courtright, K., B.L. Berg and R. Mutchnick (2000). Rehabilitation in the new machine? *International Journal of Offender Therapy and Comparative Criminology* 44: 293-311.

The Honorable Sue L. Robinson
August 30, 2010
Page -10-

### V.     Conclusion

For all of these reasons, and for those stated in the Motion for Downward Departure, we respectfully request that this Court not impose a sentence of incarceration.

Respectfully submitted,

Kathleen M. Jennings (No. 913)

-and-

/s/ Joseph M. Bernstein

Joseph M. Bernstein (No. 780)
10354 Flat Stone Loop
Bonita Springs, FL 34135
(239) 948-7960 – Telephone
(302) 791-1214 – Facsimile
jmbernstein@embarqmail.com

KMJ/alv
Enclosures
cc:     AUSA Robert F. Kravetz (w/ enclosures)